UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
R SQUARED GLOBAL, INC.,

                     Plaintiff,                              11 Civ. 7155 (PKC)

       -against-

                                          MEMORANDUM
                                        <u>AND ORDER</u>

SERENDIPITY 3, INC.,

                     Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff R Squared Global, Inc. ("R Squared") moves for a preliminary injunction

against defendant Serendipity 3, Inc. ("Serendipity"), the owner and operator of a New York

City restaurant famed for its array of opulent ice cream dishes.  R Squared seeks to enjoin

Serendipity from terminating the parties' licensing agreement, which grants R Squared the

exclusive right to open restaurants and sell merchandise bearing Serendipity's intellectual

property.

        Plaintiff filed an Amended Verified Complaint in this action, asserting seven

claims.[1]  (Docket #12.)  The complaint includes claims each for breach of contract and breach of

the implied covenant of good faith and fair dealing.  (<u>Id.</u>)  Plaintiff also seeks a declaratory

judgment on three separate grounds: that it is not in breach of the parties' licensing agreement;

that R Squared has not infringed Serendipity's intellectual property rights; and that Serendipity

has breached the provision of the licensing agreement governing R Squared's right to open

---

[1] Plaintiff originally filed a Verified Complaint seeking injunctive relief in New York State Supreme Court, New
York County.   In its Amended Verified Complaint, plaintiff properly invokes this Court's subject matter
jurisdiction by reason of diversity of citizenship, 28 U.S.C. § 1332.  I need not address whether there is also federal
question jurisdiction, 28 U.S.C. § 1331, by reason of plaintiff's claims under the Copyright Act of 1976 and the
Lanham Trademark Act of 1946.

additional Serendipity locations.  (Id.)  On October 12, 2011, this Court granted R Squared a temporary restraining order pending a hearing and determination of the motion for a preliminary injunction.  (Docket #5.)  On October 24, 2011, this Court presided over a hearing on R Squared's motion for a preliminary injunction.

For the reasons set forth below, R Squared has demonstrated that there are sufficiently serious questions going to the merits of whether defendant has satisfied the notice and cure requirements of the parties' agreement such as to make those questions fair ground for litigation.  R Squared has also demonstrated that the balance of hardships in terminating its license, which enables R Squared to operate these restaurants, tips decidedly in its favor and that it would suffer irreparable injury in the absence of an injunction.  R Squared's motion for a preliminary injunction (Docket #8) is therefore granted.

<u>BACKGROUND</u>

Serendipity is a New York corporation that owns and operates a restaurant and dessert parlor in New York, NY under the name "Serendipity 3."  (Am. Compl. ¶ 4.)  R Squared is a Nevada corporation whose sole business is as the exclusive licensee of Serendipity's trademarks and copyrights.  (Id. ¶¶ 3, 10.)  Rowen Seibel, R Squared's founder and sole employee, formed R Squared "for the sole and express purpose" of becoming the exclusive licensee of Serendipity.  (Id. ¶ 8.)  Pursuant to their arrangement, R Squared owns and operates three Serendipity restaurants located in Las Vegas, NV, Boca Raton, FL, and Washington, DC (the "Georgetown" location).

I.      <u>The Licensing Agreement</u>

The licensing agreement ("Agreement"), which the parties entered into on September 14, 2005, represents a comprehensive licensing arrangement of Serendipity's

intellectual property to R Squared.[2]  In exchange for enjoying the exclusive right to open and operate Serendipity restaurants in any location outside of New York and Nassau counties, R Squared pays royalties to Serendipity.  (Id. ¶¶ 12, 14, 16.)  The Agreement provides for an initial term of ten years, after which R Squared may elect to renew for up to two additional five-year terms provided R Squared is not in "Material Breach."  (Id. ¶ 11.)  The Agreement also details R Squared's right to open and operate new Serendipity locations, as well as R Squared's right to enter into sublicensing arrangements with third parties.  (Id. ¶¶ 20-25.)

Three provisions of the Agreement are particularly relevant to plaintiff's pending motion for injunctive relief.  The first is paragraph 2.3, labeled "Merchandising."  (Aff. Stephen Bruce Ex. A ("Agreement"), at 2-3.)  Paragraph 2.3 addresses the scope of R Squared's rights to sell branded merchandise bearing Serendipity's intellectual property at R Squared's Serendipity locations.  R Squared "must purchase any Licensed Merchandise to be sold in the Merchandising Outlets" directly from Serendipity.  If R Squared should purchase merchandise elsewhere, it must obtain advance written approval "on a product by product basis" before selling it.  (Id. at 3.)  R Squared therefore must either purchase any item of Serendipity-branded merchandise directly from Serendipity or receive its prior written approval before selling or displaying it.  (Id.)

Paragraph 10, titled "Intellectual Property Protection," defines the parties' rights and obligations regarding Serendipity's trademarks and copyrights.  Under paragraph 10.2, R Squared must "display [Serendipity's] Intellectual Property only in such form and manner as are specifically approved in advance in writing by Serendipity."  (Id. at 10.)  Paragraph 10.3 further prohibits R Squared from "identify[ing] itself as the owner" of Serendipity's intellectual property.  (Id. at 11.)  Lastly, paragraph 10.6 prohibits R Squared from "tak[ing] any action

---

[2] The parties have amended the original Agreement twice by letter amendments dated May 24, 2007 and November 8, 2010, respectively.  (Aff. Stephen Bruce Exs. C, H.)

which damages the reputation of Serendipity or which reflects negatively upon Serendipity or [its] Intellectual Property." (Id. at 12.)

The third provision particularly relevant to R Squared's motion for injunctive relief is paragraph 12.1, which addresses the parties' right to termination. Paragraph 12.1 explicitly states that the Agreement "shall remain in full force and effect" unless terminated in one of three enumerated ways: (a) by mutual consent of the parties in writing; (b) by "payment breach," consisting of Serendipity giving written notice to R Squared of its failure to make a royalty payment; or (c) automatically, following written notice to R Squared of "any breach or default" that it does not cure within ninety days. (Id.) The third subparagraph—paragraph 12.1(c), titled Cure Period—is central to plaintiff's motion for injunctive relief. Paragraph 12.1(c) states:

> This Agreement shall automatically terminate ninety (90) days after written notice by Serendipity to R Squared of any breach or default by R Squared in any of its representations in this Agreement or the performance of any of its obligations under this Agreement (other than those set forth in subparagraph (b) [titled Payment Breach]) unless such breach or default is cured within such ninety (90) day period; provided that, if the nature of the breach is such that it cannot reasonably be cured within such ninety (90) day period, then R Squared shall have an additional sixty (60) days to cure same if R Squared commences the cure within the ninety (90) day period and diligently pursues same to completion. . . . Breaches covered by this subparagraph (c) shall be considered Material Breaches if not cured within the time period set forth in this subparagraph (c). Notwithstanding the foregoing, inadvertent breaches of this Agreement incapable of being cured shall not give rise to Serendipity's right to terminate this Agreement.

(Id.) In summary, Serendipity must inform R Squared in writing that R Squared has breached one of its obligations. Upon receipt of this notice, R Squared may then cure the breach within ninety days. If it cannot reasonably do so, R Squared has an additional sixty days provided that

it commences this cure process within the initial ninety-day cure period.  (Id.)  Any breach not

cured within this time period is considered a "Material Breach" of the Agreement, resulting in its

automatic termination.  (Id.)

II.      R Squared's Purported Breaches of the Agreement

        a.   The June 25, 2009 Letter

Serendipity engaged in a series of written exchanges with R Squared beginning in

June 2009 the thrust of which was to assert that R Squared was listing menu items or offering

branded merchandise that Serendipity had not approved.  R Squared asserts that in each instance,

it either cured the purported breach or obtained Serendipity's permission to continue to sell the

item.

       Counsel for Serendipity mailed R Squared and its counsel a letter dated June 25,

2009, informing R Squared that it was in breach of the Agreement pursuant to paragraph 12.1(c).

(First Aff. Rowen Seibel Ex. L ("June 25, 2009 letter"), at 1.)  The June 25, 2009 letter identified

fifteen breaches by R Squared at its Las Vegas location.[3]  The majority of violations alleged

were of paragraphs 2.3 and 10.2 of the Agreement which, as discussed above, govern R

Squared's obligations regarding the display and sale of merchandise bearing Serendipity's

intellectual property.  (Id. at 2-3.)  Specifically, the June 25, 2009 letter contended that R

Squared had breached the Agreement by, inter alia: displaying Serendipity's intellectual property

"without first securing written approval;" refusing to remove from its menu "items bearing the

names of individuals . . . notwithstanding several verbal and written requests to do so;"

manufacturing "[t-]shirts" without first securing Serendipity's approval "as to the designs

featured on such shirts;" and manufacturing "plates" bearing Serendipity's intellectual property

---

[3] The Las Vegas location was one of two Serendipity restaurants that R Squared owned and operated at the time of
Serendipity's June 25, 2009 letter.  (Am. Compl. ¶¶ 32, 37.)

(the "black and white dishware") without first securing its approval as to their design and quality. (Id. at 2.)

        In response to the June 25, 2009 letter, R Squared provided Serendipity with samples of the allegedly infringing T-shirts, black and white dishware, and individually named menu items.  Without "conceding" any of Serendipity's allegations, R Squared in a letter dated September 28, 2009 recited in detail "the steps [it had taken] to address" the alleged breaches. (First Aff. Rowen Seibel Ex. M ("September 18, 2009 letter").)  Regarding the specific items Serendipity had identified in its June 25, 2009 letter, R Squared's letter stated that it had already "rectified" the display of individually named items by removing them from its menu, and had mailed to Serendipity "samples of the subject tee shirts and plates for [Serendipity's] review." (Id. at 2.)

        The parties' correspondence over these alleged breaches concluded with a letter from Serendipity's counsel to R Squared dated November 2, 2009.  (First Aff. Rowen Seibel Ex. P ("November 2, 2009 letter").)  In its letter, Serendipity approved the black and white dishware as depicted in an attached photograph and consented to a handful of specific T-shirt designs.  (Id. at 1-3.)  For both the T-shirts and the black and white dishware, Serendipity "expressly limited" its approval to R Squared's Las Vegas location.  (Id. at 1.)

        a.   The July 2010 Letters

        In July 2010, Serendipity's counsel mailed to R Squared and its counsel two letters, each alleging breaches of the Agreement.  First, in a letter dated July 15, 2010, counsel for Serendipity again notified R Squared that it was in material breach of the Agreement pursuant to paragraphs 12.1(b) and (c).  (Aff. Stephen Bruce Ex. G ("July 15, 2010 letter").)  The letter identified a total of eight breaches, seven of which concerned R Squared's failure to pay

royalties or provide receipts used to calculate the required royalty payments.  (Id. at 1-2.)
Serendipity also alleged that R Squared had published a menu at its Boca Raton location bearing
Serendipity's intellectual property without first securing its written approval.  (Id. at 2 (citing
Agreement par. 10.2).)

       Shortly thereafter, Serendipity mailed to R Squared and its counsel a letter dated
July 26, 2010 in which it detailed a "framework" by which it would consider R Squared's
proposal for the Georgetown location.  (Aff. Stephen Bruce Ex. I ("July 26, 2010 letter").)
Serendipity's primary request in the letter was for R Squared to pay overdue royalties.  (Id. at 1.)
However, the letter also requested that R Squared remove "named menu items" from its Boca
Raton restaurant and to comply with the Agreement's requirement that R Squared present "any
new products" to Serendipity for review and written approval.  (Id. at 3.)  The letter stated in a
footnote that Serendipity had "made its position clear" regarding its objection to named menu
items at the Las Vegas location.  (Id.)  Moreover, in an attached photograph, the July 26, 2010
letter specifically identified as infringing a "ceramic Devil and Ice Queen beverage container."[4]
(Pl.'s Mem. at 7.)  Unlike either the June 25, 2009 or July 15, 2010 correspondence,
Serendipity's July 26, 2010 letter did not expressly assert that R Squared was in breach of
paragraph 12.1 of the Agreement.  Counsel for R Squared responded with its own letter dated
August 26, 2010 in which it both denied Serendipity's allegations and assured Serendipity that
any previous sale or display of "unapproved merchandise" had since been cured.  (Aff. Stephen
Bruce Ex. J.)  Notably, Serendipity did not object to the opening of the Georgetown restaurant by
R Squared in May 2011.

---

[4] The Devil and Ice Queen image is indisputably part of the intellectual property of Serendipity and is displayed on merchandise and other products.  (Def.'s Mem. Opp. at 7.)

III.   <u>Serendipity's Purported Termination of the Agreement</u>

On June 14, 2011, counsel for Serendipity requested in an e-mail that R Squared provide it with "one sample of each piece of merchandise" being offered for sale at all three of R Squared's Serendipity restaurants.  (Decl. Kieran G. Doyle ("Doyle Decl.") Ex. F.)  Pursuant to this request, Rowen Seibel, R Squared's founder, delivered to Serendipity a box of sample merchandise.  (Def.'s Mem. Opp. at 7.)  As he had not packed the box himself, Seibel could not confirm whether the box included all branded merchandise being sold or displayed by R Squared.  (Doyle Decl. ¶ 7.)  In response to a further inquiry from Serendipity's counsel as to whether the box included all samples, R Squared's counsel encouraged Stephen Bruce, Serendipity's president, to visit the three restaurants personally to confirm the sale of any branded merchandise.  (Def.'s Mem. Opp. at 10.)

In August 2011, Bruce hired a private investigator to visit the Las Vegas location. In a sworn affidavit, the investigator claimed that she observed on display and available for purchase the Devil and Ice Queen beverage container that Serendipity had originally identified as infringing in its July 26, 2010 letter.  (Aff. Linda Mohen ¶¶ 4, 6.)  Further investigations at all three of R Squared's Serendipity restaurants revealed the sale and display of other branded merchandise for which R Squared allegedly had not secured prior written approval.  (Doyle Decl. ¶¶ 11-13.)

On October 1, 2011, R Squared paid Serendipity a $41,250 royalty check, which Serendipity accepted and deposited.  (Oct. 24, 2011 Hr'g Tr. at 23, 75.)[5]  Two days later, in a letter dated October 3, 2011, Serendipity purported to terminate the Agreement.  (Am. Compl. ¶ 86.)  Citing paragraph 12 of the Agreement, Serendipity stated as grounds for termination "R

---

[5] There is no claim that R Squared is in arrears in any royalty payment under the Agreement.

Squared's repeated and continuing violations of Paragraphs 2.3, 10.2 and 10.6 of the Agreement through its sale of merchandise bearing Serendipity 3's Intellectual Property without the prior written approval of Serendipity 3."  (First Aff. Rowen Seibel Ex. K ("October 3, 2011 letter"), at 1.)  The letter identified fifteen items bearing Serendipity's intellectual property for which R Squared had not received prior approval, including: glassware; T-shirts; candy bars; individually named menu items, including an item called "Dr. Oz's Muesli" allegedly featured on the Las Vegas menu; popcorn; a hooded sweatshirt; shopping bags; the black and white dishware Serendipity originally claimed as infringing in its June 25, 2009 letter; and the Devil and Ice Queen beverage container that Bruce's private investigator had purchased from R Squared's Las Vegas location.  (Id. at 2-3.)

          The October 3, 2011 letter also included more generalized grounds for terminating the Agreement.  Regarding the sale and display of branded merchandise, the letter cited R Squared's "ongoing pattern of material breach, followed by fraudulent assurances of cure, followed by continued material breach," which purportedly lasted for "over two years." (Id. at 4.)  The letter also cited R Squared's "repeated refusals" to respect Serendipity's intellectual property rights and R Squared's "fraud in continually misrepresenting the nature and existence" of its breaches.  (Id.)  Serendipity also expressed concern over R Squared's marketing of merchandise containing "troubling" designs relating to "violence," "automatic weapons," and "overconsumption" of alcohol.  (Id. at 3.)  In conclusion, Serendipity asserted that because R Squared's breaches "are not capable of being cured" under paragraph 12.1(c) of the Agreement, "the only way Serendipity 3 can now protect the integrity of its Intellectual Property is to terminate the agreement."  (Id. at 4.)

<u>PRELIMINARY INJUNCTION STANDARD</u>

A court may issue a preliminary injunction "only if the movant has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor." <u>Salinger v. Colting</u>, 607 F.3d 68, 79-80 (2d Cir. 2010) (alteration in original) (internal quotations omitted). The plaintiff must also demonstrate that he is likely to suffer "irreparable injury in the absence of an injunction." <u>Id.</u> (quoting <u>Winter v. Nat. Res. Def. Council</u>, 129 S. Ct. 365, 374 (2008)). Irreparable injury is one for which a monetary award is "not adequate compensation." <u>Jayaraj v. Scappini</u>, 66 F.3d 36, 39 (2d Cir. 1995) (internal quotations omitted). A court may not "simply presume" irreparable injury, but must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits." <u>Salinger</u>, 607 F.3d at 80.

<u>DISCUSSION</u>

R Squared moves to enjoin Serendipity from terminating the Agreement. R Squared contends that Serendipity is not entitled to terminate the Agreement—as it purports to do in its October 3, 2011 letter—without first affording R Squared ninety days to cure any breaches pursuant to Paragraph 12.1(c). (Pl.'s Mem. at 1, 3-4.) In opposing R Squared's motion, Serendipity contends that R Squared has "engaged in a pattern of material breaches" dating back to June 2009 that were "never cured" and are no longer capable of being cured. (Def.'s Mem. Opp. at 16-20.) Serendipity maintains that R Squared "need not be afforded the opportunity to cure" any alleged breaches and that, accordingly, its October 3, 2011 letter constitutes a valid termination of the Agreement. (<u>Id.</u> at 19-20.)

I.  <u>The Merits</u>

   a.  <u>R Squared Has Demonstrated Sufficiently Serious Questions Going to the
       Merits to Make Them a Fair Ground for Litigation</u>

Plaintiff R Squared has demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation.[6]  <u>See</u> <u>Salinger</u>, 607 F.3d at 79.  First, paragraph 12.1(c) of the Agreement explicitly grants R Squared a ninety-day period with which to cure any breach or default following "written notice by Serendipity."  (Agreement par. 12.1.)  The Agreement only terminates—if at all—<u>after</u> Serendipity has notified R Squared in writing of any purported breaches where R Squared then subsequently fails to cure them within ninety days or, if impracticable, an additional sixty days.  (<u>Id.</u>)  The October 3, 2011 letter, in part, purports to terminate the Agreement based upon newly discovered breaches and the plain language of the termination provisions forecloses termination without a cure period.

Serendipity urges its right to terminate the Agreement due to R Squared's "pattern of material breaches" and failure to cure prior breaches "despite several opportunities to do so." (Def.'s Mem. Opp. at 17-18.)  Paragraph 12.1 explicitly states that the Agreement "shall remain in full force and effect" unless terminated in one of three enumerated ways: by mutual consent; R Squared's failure to pay royalties; or following written notice to R Squared of a breach plus expiration of the ensuing cure period.  (Agreement par. 12.1(a)-(c).)  Paragraph 12.2 then details the parties' obligations upon termination, such as R Squared's removal and return of branded Serendipity merchandise and payment of any past due royalties.  (<u>Id.</u> par. 12.2(b)-(c).)  Nothing in paragraph 12—titled "Termination"—grants either party the right to terminate the Agreement upon any other condition or occurrence.

---

[6] Because R Squared has demonstrated  not only sufficiently serious questions going to the merits of the litigation, but also that the balance of equities tips decidedly in its favor, this Court need not address whether R Squared is likely to succeed on the merits.  <u>See</u> <u>Citigroup Global Mkts., Inc. v. VCS Special Opportunities Master Fund Ltd.</u>, 598 F.3d 30, 35 (2d Cir. 2010).

Most importantly, the record casts serious doubt that the breaches Serendipity identified in its October 3, 2011 letter had been previously cited as breaches in prior written correspondence.  The October 3, 2011 letter specifically identifies fifteen items that R Squared did not include in the box of merchandise it mailed to Serendipity in July 2011 and for which it allegedly had not received prior written approval.  (First Aff. Rowen Seibel Ex. K, at 1-3.)  The black and white dishware was the only one of those fifteen items to which Serendipity had previously provided written objection pursuant to paragraph 12.1(c) of the Agreement.  (Id. Ex. L.)  However, in a letter dated November 2, 2009, Serendipity granted R Squared written approval to display the black and white dishware at its Las Vegas location.  (Id. Ex. P.)  Any subsequent sale or display of the dishware at another location, either Boca Raton or Georgetown, is properly subject to the notice and cure provisions of paragraph 12.1(c).  To the extent that R Squared failed to obtain written approval to sell or display any of the remaining items Serendipity identifies in its termination letter, paragraph 12.1(c) affords R Squared a ninety-day cure period.

The October 3, 2011 termination letter also cites a menu item, "Dr. Oz's Muesli," to which it objects.  But there is substantial evidence that Serendipity never raised this objection prior to the notice of termination.  Seibel stated in his affidavit that Serendipity's October 3, 2011 letter "was the first time [he] learned that 'Dr. Oz's Muesli' was on the Las Vegas menu" and that the item "had never been the subject of a complaint by Serendipity."  (Second Aff. Rowen Seibel ¶ 12.)  Serendipity's first June 25, 2009 letter objects to "items bearing the names of individuals," but does not cite or refer to Dr. Oz's Muesli; indeed, neither party contends that R Squared sold or displayed Dr. Oz's Muesli at the time of the June 25, 2009 letter.  Moreover, R Squared effectively cured Serendipity's June 25, 2009 objection by providing Serendipity with

written confirmation of its removal of all named menu items in its September 18, 2009 letter. (First Aff. Rowen Seibel Ex. M.)  Accordingly, paragraph 12.1(c) requires that Serendipity afford R Squared ninety days for which to remove this item from its Las Vegas menu.[7]

The October 3, 2011 letter also purports to base termination on the improper sale of T-shirts, but there is substantial evidence that Serendipity did not provide a cure period for the designs of T-shirts on sale.  Serendipity did object to R Squared's sale of branded T-shirts in its June 25, 2009 letter.  (Id. Ex. L.)  However, this letter does not identify any specific designs, while its November 2, 2009 letter expressly approves a number of T-shirt designs.  (Id. Ex. P.)[8] In approving these T-shirt designs, Serendipity's November 2, 2009 letter goes so far as to state that R Squared will need to "secure prior written approval" for "any additional display of [Serendipity's IP] on new t-shirts.  (Id. at 2.)  If in fact R Squared thereafter sold or displayed T-shirts for which it had not secured prior written approval, paragraph 12.1(c) requires Serendipity to provide it with written notice of breach, triggering the ninety-day cure period.

Lastly, R Squared's display of the Devil and Ice Queen beverage container at its Las Vegas restaurant in August 2011 does not support Serendipity's purported termination of the Agreement.  Serendipity originally expressed disapproval over R Squared's production of the Devil and Ice Queen beverage container in its letter dated July 26, 2010.  (Aff. Stephen Bruce Ex. I.)  In its letter dated August 25, 2010, R Squared "affirmatively advise[d Serendipity and its counsel] that no sale of unapproved merchandise is taking place as of the writing of this letter." (Id. Ex. J, at 2.)  If Serendipity's private investigator was able to purchase the item from an

---

[7] Seibel attests that Dr. Oz's Muesli was included on the Las Vegas menu "in error by a manager at the restaurant" and that "as soon as [Seibel] learned of it, it was removed."  (Second Aff. Rowen Seibel ¶ 12.)
[8] Serendipity's November 2, 2009 letter also includes an invoice in which Serendipity approves delivery of the "PEACE LOVE SERENDIPITY" T-shirts to R Squared's Las Vegas location.  (Id.)

employee of R Squared's Las Vegas restaurant in August 2011, paragraph 12.1(c) of the parties' Agreement required Serendipity to give R Squared ninety days to cure such breach.

At the preliminary injunction stage, the record demonstrates that there is a serious question—and serious doubt—that Serendipity afforded R Squared the proper cure period before terminating the Agreement in its October 3, 2011 letter. R Squared's position more than amply raises a fair ground for litigation.

b. The Balance of Hardships Tips Decidedly in R Squared's Favor

In addition to sufficiently serious questions going to the merits of the parties' dispute, the balance of hardships tips decidedly in plaintiff R Squared's favor. See Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008). Granting R Squared's motion for injunctive relief simply maintains the parties' existing obligations under their Agreement. R Squared will continue to pay royalties to Serendipity for licensing its intellectual property, while Serendipity maintains the right to hold R Squared in breach of the Agreement pursuant to Paragraph 12.1's three termination provisions. R Squared has paid Serendipity over $ 1 million in fees and royalties and fully intends to renew the Agreement for an additional ten years as provided for in paragraph 11. (First Aff. Rowen Seibel ¶ 7.) The balance of equities tips decidedly in favor of requiring that the parties continue fulfilling their obligations under the Agreement.

Moreover, the negative impact on R Squared were this Court to deny its motion far outweighs the negative impact on Serendipity were this Court to rule otherwise. First, R Squared's sale of licensed merchandise under paragraph 2.3 accounts for a de minimus share of the revenues R Squared generates under the Agreement. In a sworn affidavit, Seibel testified that its sales of branded Serendipity merchandise supplied by outside parties (i.e., non-Serendipity sources) accounts for less than one-half of one percent of its gross sales revenues at

14

the Las Vegas restaurant.  (Second Aff. Rowen Seibel ¶ 3.)  To the extent that R Squared has

sold or displayed merchandise that is "antithetical to" or "has irreparably tainted" Serendipity's

brand (Def.'s Opp. Mem. at 20), such concern is clearly outweighed by the loss of jobs of

hundreds of employees at R Squared's three restaurants that would result were this Court to deny

R Squared's motion.  (First Aff. Rowen Seibel ¶ 57.)

        Furthermore, Seibel swears in his affidavit that R Squared has already addressed

each of Serendipity's purported bases for termination.  Specifically, Seibel states that he has

"removed all of the merchandise identified in the October 3 letter from display" and that the

items "Serendipity claim[s] were being offered for sale in Boca Raton or Georgetown are no

longer being offered for sale."  (Id. ¶¶ 43-44.)  Indeed, counsel for R Squared mailed to

Serendipity a letter dated October 11, 2011 in which it notified Serendipity that all alleged

breaches had been cured.  (Id. ¶ 45.)  Based on the substantial harm that would accrue to R

Squared coupled with evidence indicating that R Squared has already cured its purported

breaches, the balance of equities decidedly favors enforcing the parties' Agreement through the

pendency of this litigation.

        Serendipity nonetheless maintains that R Squared is not entitled to injunctive

relief because it has engaged in an "ongoing pattern of material breach" featuring "fraudulent

assurances of cure" and "attempt[s] to deceive" Serendipity.  (Def.'s Mem. Opp. at 16-17, 19.)

Such contentions do not find support in the record.  Rather, this Court credits movant's

contention that since 2009, the parties' approval process for branded merchandise has been "very

informal."  (Second Aff. Rowen Seibel ¶ 8.)  Indeed, Seibel swears in his affidavit that the

parties had an ongoing practice whereby R Squared would occasionally deliver boxes of

merchandise to Serendipity's New York location and then would "not hear any objections from

[Serendipity's president Stephen] Bruce for months."  (Id.)  These boxes included every item

Serendipity cited as infringing in its October 3, 2011 termination letter, which Serendipity "never

objected to" despite having "known about [the items] for many months."  (Id. ¶ 16.)  Seibel

attests that on other occasions, he would receive informal comments on the boxed merchandise

by telephone or e-mail from  an employee at an independent public relations firm—not even

from Bruce himself.  (Id. ¶ 9.)

       Lastly, Serendipity's termination letter points to numerous items that it never

approved, but there is no evidence that since November 2009 Serendipity ever gave express

written approval for any merchandise using the procedures articulated in paragraph 2.3.  (Id.)  In

the absence of evidence that R Squared has acted in bad faith to evade its contractual obligations,

the balance of equities favors the continued enforcement of the parties' Agreement.

       "The 'serious questions' standard permits a district court to grant a preliminary

injunction in situations where it cannot determine with certainty that the moving party is more likely

than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits

of not granting the injunction."  Citigroup Global Mkts., Inc. v. VCS Special Opportunities Master

Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).  Paragraph 12.1(c) of the Agreement sets forth explicit

procedures for the resolution of purported breaches of its licensing, branding, and merchandising

provisions.  Nothing in this subparagraph or any other provision grants Serendipity the power to

unilaterally terminate the Agreement without first affording R Squared an opportunity to cure.  The

evidence contained in the record raises a sufficiently serious question as to whether Serendipity had

ever given prior written notice of any of the breaches it cites as grounds for termination.  Moreover,

the evidence and submissions by the parties suggest that R Squared has already cured these breaches

and that R Squared intends to continue operating under the Agreement—as it did by paying

Serendipity over $40,000 in royalties just two days prior to the termination letter.  (Oct. 24, 2011 Hr'g Tr. at 23, 75.)

This Court therefore finds that plaintiff has demonstrated sufficiently serious questions going to the merits of the litigation and a balance of hardships tipping decidedly in its favor.  See Citigroup, 598 F.3d at 35.  Accordingly, R Squared has satisfied the first requirement of its two-part showing in obtaining injunctive relief.

II.     Irreparable Injury

Plaintiff R Squared has also demonstrated that "it is likely to suffer irreparable injury in the absence of an injunction."  Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (quoting Winter v. Nat. Res. Def. Council, 129 S. Ct. 365, 374 (2008)).  Generally, a showing of irreparable injury "is the single most important prerequisite for the issuance of a preliminary injunction."  Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (internal quotations omitted).  "Irreparable harm is injury for which a monetary award cannot be adequate compensation."  Int'l Dairy Foods Assoc. v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996) (internal quotations omitted).  The injury that R Squared would suffer in the absence of injunctive relief must be one "that is neither remote nor speculative, but actual and imminent."  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotations omitted).

R Squared has shown that it will suffer irreparable injury were this Court to deny its motion for injunctive relief.  Absent an injunction, Serendipity will terminate the parties' Agreement.  In the event of termination, R Squared—as Serendipity's exclusive licensee—shall cease to have any rights to sell, display, market, or advertise Serendipity-branded merchandise or products at any location.  (Agreement par. 12.2(a)-(b).)  Termination of the Agreement will thus force R Squared to cease operation of all three of its Serendipity restaurants, jeopardizing the

"jobs of hundreds of employees" and preventing Seibel from operating the very business for which R Squared was formed.  (First Aff. Rowen Seibel ¶ 57.)

   In determining whether the risk of irreparable injury exists, "the right to continue a business is not measurable entirely in monetary terms."  Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995) (quoting Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970)).  In its motion, R Squared does not seek merely to avoid lost profits, but the loss of its entire business, present and prospective customers, and commercial goodwill.  Where a licensee demonstrates facts showing that termination of its licensing agreement will lead to such non-monetary losses, it is has met its burden of showing irreparable injury absent injunctive relief.  See Freeplay Music, Inc. v. Verance Corp., 80 Fed. Appx. 137, 138 (2d Cir. 2003) (non-precedential) (affirming the denial of an injunction seeking to enjoin termination of licensing agreement where movant failed to show a "loss of prospective goodwill or customers . . . []or that because its licensing agreement with [defendant] was its business, it would have no business to conduct" (internal citation omitted)).  Indeed, where the "very viability of the plaintiff's business" is threatened with termination—potentially resulting in "losses beyond those of the terminated product"—irreparable harm exists.  Tom Doherty Assocs., 60 F.3d at 38.

   Accordingly, R Squared has satisfied its burden of demonstrating that it will suffer irreparable injury in the absence of an injunction preventing Serendipity from terminating the parties' Agreement.  R Squared thus has satisfied this Circuit's two-prong test for the issuance of a preliminary injunction.  See Citigroup, 598 F.3d at 35.

CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction (Docket #8) is GRANTED.  Defendant is enjoined from terminating the Agreement pending a trial on the merits.  The grant of a preliminary injunction is conditioned upon plaintiff posting a bond in the amount of $60,000 by November 18, 2011.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
        November 3, 2011

SO ORDERED.

Dated: New York, New York
       November 3, 2011

_____
P. Kevin Castel
United States District Judge

20